**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO**

| | | |
|---|---|---|
| JACQUES R. BERNARD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. |
| | ) | |
| OPPENHEIMERFUNDS, INC., | ) | |
| a Colorado Corporation, | ) | |
| OPPENHEIMERFUNDS DISTRIBUTOR, | ) | |
| INC., a New York Corporation, and | ) | **JURY TRIAL REQUESTED** |
| ANGELO MANIOUDAKIS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Jacques R. Bernard, by and through his attorneys, Stoltmann Law Offices, P.C. and Higgins & Burke, P.C., brings this Complaint at law against defendants OppenheimerFunds, Inc., OppenheimerFunds Distributor, Inc. and Angelo Manioudakis, and states as follows:

## Parties

1.   Plaintiff Jacques R. Bernard (hereinafter "Mr. Bernard or "Plaintiff") is an individual who at all times relevant resided in Greenacres, Florida.  As of the date of the filing of this complaint, Mr. Bernard intends to remain in Florida indefinitely and is domiciled in the State of Florida.

2.   Defendant OppenheimerFunds, Inc. (hereinafter "Defendant" or "OFI") is a Colorado corporation with its principal place of business at 2 World Financial Center, 225 Liberty Street, 11th Floor in New York, New York.  OFI was the manager and investment advisor of the Oppenheimer Champion Income Fund (hereinafter the "Fund" or the "Champion

Income Fund") and handled the day-to-day management of the Fund at all times relevant. OFI earned a fee for its management of the Fund.

3.    Defendant OppenheimerFunds Distributors, Inc. (hereinafter "Defendant" or "OFDI") is a New York corporation with its principal place of business at 2 World Financial Center, 225 Liberty Street, 11th Floor in New York, New York.  OFDI is a subsidiary of OFI and was the principal underwriter and distributor of the Champion Income Fund at all times relevant.  OFDI and OFI are sometimes collectively referred to as "Oppenheimer."

4.    Defendant Angelo Manioudakis (hereinafter "Defendant" or "Defendant Manioudakis") is an individual and resides in Boston, Massachusetts.  Defendant Manioudakis is believed to be physically present in the State of Massachusetts and domiciled in the State of Massachusetts.  Defendant Manioudakis was previously the portfolio manager of the Champion Income Fund and was employed by OFI and OFDI.  Upon information and belief, Manioudakis was a Vice-President of OFI.  Manioudakis took over the day-to-day management of the Fund in late 2006 and was responsible for the Fund's management until his termination in December 2008.

## Jurisdiction and Venue

5.    Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 as the Defendants did business in this district, sold investment products in this district, and the misleading materials at issue were believed to be prepared and drafted in this district.

6.    Plaintiff Jacques R. Bernard is domiciled in the State of Florida and is a citizen of the State of Florida.

7.    Defendant OFI has its principal place of business in the State of New York, is

incorporated under the laws of the State of Colorado, and is therefore a citizen of the States of New York and Colorado.  Defendant OFDI has its principal place of business in the State of New York, is incorporated under the laws of the State of New York, and is therefore a citizen of the State of New York.  Defendant Manioudakis is domiciled in the State of Massachusetts and is a citizen of the State of Massachusetts.

8.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the plaintiff and all defendants, and the amount in controversy exceeds $75,000.

## Fact Common to All Counts

9.   The Oppenheimer Champion Income Fund is an open-ended management investment company registered with the Securities and Exchange Commission.  This Fund sold five classes of shares, including Class A, B, C, N, and Y.

10.   The Oppenheimer Core Bond Fund is an open-ended management investment company registered with the Securities and Exchange Commission.  This Fund sold five classes of shares, including Class A, B, C, N, and Y.  The Core Bond Fund and Champion Income Fund shall sometimes be referred to as the "Funds" collectively in this Complaint.

10.   The Funds have no employees.  Instead, the Funds are managed by an investment manager (in this case, OFI) under a management contract that is approved by the Fund's Board of Trustees.  In return, OFI provides employees, including Manioudakis, to act as the Funds' officers and manage the fund.

11.   OFI is responsible for making all day-to-day investment decisions for the Funds, including decisions as to what assets the Funds will investment in.  Defendant Manioudakis headed the team of OFI employees that made these day-to-day decisions for

both Funds.

12.     OFDI is the principal underwriter and distributor of the Funds' shares.  OFDI typically

        has selling arrangements with securities broker-dealers who then sell the Funds to

        investors.  OFDI helped draft the public offering and registration documents and other

        marketing materials sent to the investing public.

13.     Upon information and belief, OFDI has a selling arrangement with Chase Investment

        Services Corporation to sell the Funds to investors.

14.     The Plaintiff purchased shares of the Champion Income Fund and Core Bond Fund

        through a Chase Investment Services broker named Vesna Ranisavljevic.

15.     Ms. Ranisavljevic solicited the Plaintiff to invest in the Champion Income Fund and Core

        Bond Fund from her office in Valley Stream, New York.  When recommending to the

        Plaintiff to purchase these shares, it is believed that Ms. Raniasavljevic relied upon

        information that was given to her from OFI and OFDI. Raniasavljevic in turn

        communicated to the Plaintiffs in general terms that she believed the Champion Income

        Fund and Core Bond Fund were safe.

16.     Had Ms. Raniasavljevic known that Manioudakis, as agent for OFI and OFDI, was going

        to take huge risks with the Champion Income Fund, she never would have recommended

        this product to her clients.

17.     The Plaintiff relied upon the information that was given to them by Ms. Raniasavljevic

        when deciding to invest in the Funds.  The Plaintiff believed that these Funds were

        relatively safe, generated high income, and that it had the normal risks associated with a

        typical high yield bond fund.  However, the Plaintiff was not aware of the extreme risk

        that these Funds were taking on.

18.    OFI and OFDI substantially misrepresented the highly speculative nature of the Champion Income Fund and Core Bond Fund.  The risks of these Funds were materially misrepresented to the investing public, including the Plaintiff.

19.    Moreover, Manioudakis, as agent for OFI and OFDI, mismanaged the Champion Income Fund and Core Bond Fund.  He did not invest the Funds' assets in a safe, prudent manner and recklessly made the Funds very risky.

20.    Manioudakis also exceeded the parameters of the Funds as outlined in the Funds' prospectus and Statement of Additional Information when he concentrated the underlying assets of the Funds in the mortgage industry, and when he used more leverage in the Funds than was allowed.

21.    In 2008, the value of the Champion Income Fund's shares dropped approximately 80 percent, with staggering losses of nearly 55% in the month of November 2008 alone.  As the value of these shares fell, so did the value of each of the Plaintiff's investment in the Champion Income Fund.

22.    The Champion Income Fund was portrayed by the Defendants as a relatively safe bond mutual fund that did not involve "undue risk."  For example, the August 7, 2006 prospectus states:

WHAT ARE THE FUND'S INVESTMENT OBJECTIVES? The Fund's primary objective is to seek a high level of current income by investing mainly in a **diversified portfolio** of high-yield, lower-grade, fixed-income securities that the Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), believes **do not involve undue risk**. The Fund's secondary objective is to seek capital growth when consistent with its primary objective.

* * *

WHO IS THE FUND DESIGNED FOR? The Fund is designed primarily for investors seeking high current income from a fund that invests mainly in lower-grade domestic and

foreign fixed-income debt securities.  Those investors should be willing to assume the greater risks of short-term share price fluctuations that are typical for a fund that invests mainly in high-yield domestic and foreign fixed-income debt securities, which also have special credit risks.  Since the Fund's income level will fluctuate, it is not designed for investors needing an assured level of current income.  The Fund is intended to be a long-term investment and **may be appropriate as a part of a retirement plan portfolio**.  The Fund is not a complete investment program.

See August 7, 2006 Prospectus (emphasis added).

23.     Similar representations were made in the prospectuses as far back as January 2001 and up through and including January 2008.  The prospectuses make no disclosures that this Champion Income Fund was dramatically riskier than the peer group of high yield bond mutual funds.

24.     In 2008, the value of the Core Bond Fund's shares dropped approximately 36 percent.  As the value of these shares fell, so did the value of the Plaintiff's investment in the Core Bond Fund.

25.     The Core Bond Fund was portrayed by the Defendants as a relatively safe bond mutual fund.  For example, the April 29, 2008 prospectus stated:

> WHAT DOES THE FUND MAINLY INVEST IN? As a non-fundamental policy (which will not be changed without providing 60 days' notice to Fund shareholders), under normal market conditions, **the Fund invests at least 80% of its net assets (plus borrowing for investment purposes) in investment grade debt securities**.  Those investment-grade debt securities can include:
> *domestic and foreign corporate debt obligations;
> *domestic and foreign government bonds, including U.S. government securities; and
> *mortgage-related securities (including collateralized mortgage obligations ("CMOs") issued by private insurers.
>
> In general, these debt securities are referred to as "bonds." The Fund's investments in U.S. government securities include securities issued or guaranteed by the U.S. government or its agencies or federally-chartered corporate entities referred to as "instrumentalities."   These include mortgage-related U.S. government securities and CMOs.   The Fund can invest in money market instruments and other debt obligations.   The Fund can invest up to 20% of its total

assets in high-yield debt securities that are below investment-grade (commonly referred to "junk bonds.")

The Fund can also use derivative instruments, including futures, swaps, CMOs and "structured" notes, to seek higher investment returns or to manage investment risks. These investments are more fully explained in "About the Fund's Investments", below.

There is no set allocation of the Fund's assets among the classes of securities the Fund buys, **but the Fund focuses mainly on U.S. government securities and investment-grade debt securities**. However, if market conditions change, the Fund's portfolio managers might change the relative allocation of the Fund's assets.

The Fund seeks to maintain an average effective portfolio duration (discussed in "About the Fund's Investments", below) of three to six years (measured on a dollar-weighted basis) to try to reduce the volatility of the value of its securities portfolio. The Fund has no limitations on the range of maturities of the debt securities in which it can invest and therefore may hold bonds with short-, medium-, or long-term maturities. Because of market events and interest rate changes, the duration of the portfolio might not meet that target at all times. **The Fund's investment manager, OppenheimerFunds, Inc. (the "Manager") will attempt to maintain the overall weighted average credit quality of the portfolio at a rating of "A-" (or equivalent) or higher** from any nationally recognized credit rating organization.

HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL? In selecting securities for the Fund, the Fund's portfolio managers analyze the overall investment opportunities and risks in different sectors of the debt securities markets by focusing on business cycle analysis and relative values between the corporate and government sectors. **The portfolio managers' overall strategy is to build a broadly diversified portfolio of corporate and government bonds.** The portfolio managers currently focus on the factors below (which may vary in particular cases and may change over time), looking for:

    \*Debt securities in market sectors that offer attractive relative value,
    **\*Investment-grade securities that offer more income than U.S. treasury obligations with a good balance of risk and return**,
    \*High income potential from different types of corporate and government securities, and
    **\*Broad portfolio diversification to help reduce the volatility of the Fund's share price.**

\* \* \*

WHO IS THE FUND DESIGNED FOR? **The Fund is designed for investors seeking total return from a fund that invests primarily in investment-grade debt securities but which can also hold high-yield, below investment grade debt securities**. Those investors should be willing to assume the credit risks of a fund that typically invests a significant amount of its assets in corporate-debt securities, and the changes in share prices that can occur when interest rates change. **The Fund is intended as a long-term investments, not a short-term trading vehicle, and may be appropriate for a part of an investor's retirement plan portfolio.** The Fund is not a complete investment program.

See April 29, 2008 Prospectus (emphasis added).

26.     The Prospectus and Statement of Additional Information make no disclosures that this Core Bond Fund was dramatically riskier than the peer group of bond mutual funds.

27.     The April 2008 prospectus for the Core Bond Fund invited investors to rely upon its past performance to show that the Core Bond Fund was not risky.  Under the heading "The Fund's Past Performance", the prospectus states that:

The bar chart and table below **show one measure of the risks of investing in the Fund**, by showing changes in the Fund's performance (for its Class A shares) from year to year for the last 10 calendar years and by showing how the average annual total returns of the Fund's shares, both before and after taxes, **compare to those of broad-based market indices** (emphasis added).

The prospectus then shows how the Core Bond Fund's returns were between a high of 10.06% and a low of -1.65%, with typical results between 4.5% and 6%, reflecting the supposedly conservative nature of the Core Bond Fund.

28.     The Defendants portrayed these Funds to be conservative or safe bond funds.  As an example, as of December 31, 2007, the Oppenheimer Conservative Investor Fund had approximately 11% of its internal holdings invested in the Champion Income Fund.

29.     OFI and OFDI portrayed high-yield fixed-income mutual funds to be relatively safe to the investing public.  For example, in an Oppenheimer brochure entitled "Saving for Retirement: How to Make the Most of Your Company's Plan" dated February 21, 2005,

Oppenheimer compared high-yield fixed-income mutual funds to other equity-based mutual funds.  This article is attached hereto and incorporated by reference as **Exhibit 1**. Page 13 of this article presents a chart showing the relative degrees of risk in a mutual fund – from cash as being the most conservative to global and international equity mutual funds being the most aggressive and riskiest mutual funds.   The chart shows that Oppenheimer considers high-yield fixed-income mutual funds (like the Champion Income Fund) to be less aggressive and more conservative than any equity mutual funds. The chart also shows that "aggregate fixed income" funds, like the Core Bond Fund, to be even safer than high-yield funds and only marginally riskier than cash.

30.     The Champion Income Fund and Core Bond Fund were anything but safe, and any representations to the contrary made by the Defendants were false.

31.     The Defendants failed to accurately represent the risks and characteristics of the Champion Income Fund and Core Bond Fund and misled investors, including the Plaintiff.

32.     The representations made by the Defendants were false and misleading for a number of reasons:

a)      The Funds pursued risky trading strategies beginning in late 2006 when Defendant Manioudakis started concentrating the Funds' assets in speculative mortgage-backed securities and derivative investments;

b)      The Funds' strategy created an undue amount of risk and did not adequately disclose the illiquid nature of these derivatives and mortgage-backed securities;

c)      The Funds failed to disclose the extent to which the assets in the Funds were exposed to leverage, thereby increasing the risk;

d)      The Funds failed to disclose the risks related to concentrating the Funds' assets in one particular industry or in one type of investment;

e)      The Funds exceeded the allowable amount of "illiquid" or "restricted" securities that the Funds could invest in; and

f)      The Funds did not identify the tranches of the derivatives being purchased by the Funds and failed to address the significantly different risks and characteristics of lower-level tranches as compared to higher-level tranches.

33.     The Funds' new trading strategy beginning at the end of 2006 and continuing through the end of 2008 gambled on these derivatives and mortgage-backed securities, but the Defendants failed to adequately inform investors of this new strategy.  The Defendants failed to inform the Plaintiff and other investors that this new trading strategy was dramatically riskier than those previously used.

34.     As part of this new strategy, the Champion Income Fund and Core Bond Fund began investing in total-return swaps.  Total-return swaps are highly illiquid, speculative and complex agreements between parties to exchange cash flows in the future based on how a set of securities performs. Specifically, the Funds were betting that top-rated commercial mortgage-backed securities would rally in 2008. The Funds gambled on these total-return swaps and lost.

35.     In addition to investing in total-return swaps as part of this new trading strategy, the Champion Income Fund and Core Bond Fund were also concentrated in credit-default swaps ("CDSs"). CDSs are similar to insurance contracts that protect investors against bond and loan defaults (or other specified credit events like bankruptcy or restructuring). In exchange for being responsible to pay out for such issues, CDS sellers receive a stream

of interest payments from the CDS buyers.  It is not necessary for the buyer to own the underlying credit instrument to buy these CDSs.  **The CDSs in the Champion Fund declined $238 million through September 2008 alone**, adversely impacting thousands of investors who had invested in the Champion Income Fund not knowing the extent of the high-risk, inappropriate gamble taken by the Defendants**.**

36.    Selling CDSs is extremely risky and speculative when insuring companies are already struggling with credit problems.  Through at least September 2008, both Funds were selling CDSs on troubled companies including Lehman Brothers Holdings Inc., American International Group Inc., General Motors Corp. and newspaper company Tribune Co. Many of those firms have collapsed, filed for bankruptcy, or otherwise had problems leaving holders of the Champion Income Fund financially devastated.  The risks of these securities were well known to the Champion Income Fund and Core Bond Fund managers prior to the Funds' meltdown occurring, but the extent of this risk was not adequately disclosed to the Plaintiff.

37.    As part of this new strategy, the Core Bond Fund also had an enormous concentration in mortgage-backed securities.  During various times throughout the 2008 calendar year, the Core Bond Fund had anywhere from 53% to 64% of its assets in mortgage related bonds. This is not a diversified portfolio.  Of course, as the mortgage market fell during 2008, the net asset value of the Core Bond Fund suffered accordingly.  The over-concentration of the net assets in the same industry was clearly inappropriate and grossly negligent, if not fraudulent.

38.   While the Champion Income Fund and Core Bond Fund can invest in derivatives, the Funds took a massive bet in some of the riskiest derivative tranches available. These risks were not adequately disclosed to purchasers in any other manner than cursory, boilerplate disclosures. No specific detailed risk disclosures were provided. These derivatives added leverage to the Funds because they allowed the Funds to bet on more securities than they actually hold in the portfolio. This exacerbated losses when the Funds were already declining. The risks of the Funds made them much more similar to hedge funds than the high and aggregate income funds they were portrayed to clients in offering and marketing materials.

39.   The Champion Income Fund also increased its gamble on falling mortgage related bonds in 2008. For example, mortgage securities tied to Washington Mutual Inc. with a $9 million principal value were valued at only $3 million at the end of September 2008. A set of five Freddie Mac mortgage-backed securities with a combined principal amount of $20 million were valued at just $2.5 million. As defaults continued to rise, the mortgage related holdings plummeted. While this sort of sector bet might be appropriate for a sector fund or hedge fund, the Champion Income Fund was not meant to be a sector or hedge fund and was represented to investors as an appropriate investment for conservative investors.

40.   The Champion Income Fund's trading strategy exacerbated its losses when it made a sector bet in struggling Wall Street brokerage firms. For example, the Fund purchased Lehman Brothers bonds between June 1, 2008 and September 30, 2008 with $29 million in principal value. Lehman Brothers filed for Chapter 11 bankruptcy-court protection in mid-September 2008, and those bonds fell to just $144,000. The Champion Income Fund

also added Morgan Stanley bonds with $13 million in principal during that period. The bonds were valued at approximately $8.3 million by the end of September 2008. These investments may have been appropriate for a financial sector fund or aggressive growth fund but not for what was portrayed as a conservative bond fund.

41.   Pursuant to the parameters of both Funds as set forth in its prospectuses and Statements of Additional Information, the Funds were allowed borrow money up to 33.3% in excess of the total value of its assets.  However, both Funds exceeded this amount and were over-leveraged.  "Leverage" refers to the use of borrowed money an in investing in effort to increase the Funds' returns; however, with a potential in this increased return also comes increased risk.  The credit default swaps, total return swaps, and derivatives that the Funds invested in were also leveraged

42.   This increased leverage meant that the Funds took on substantially more risk than what was allowed.  When the value of the leveraged assets within the Funds dropped, this exacerbated the losses.

43.   For example, it is believed that the Champion Income Fund had approximately $2 billion in net assets in March 2008.  It is also believed that the Champion Income Fund had used $3.2 billion of leverage through the use of these derivatives.  Thus, the Champion Income Fund borrowed more than 100% of its total value of assets, significantly higher than the 33.3% that was allowed.

44.   Similarly, the Champion Income Fund was allowed to invest up to 25% of its assets in one industry.  However, it is believed that the Champion Income Fund had a huge over-concentration in the mortgage industry, well above this 25% amount.   Again, Manioudakis invested the assets of the Fund beyond what was allowed.

45. Likewise, the Champion Income Fund was allowed to invest up to 10% of its assets in "illiquid" or "restricted" securities – securities which have no active trading market, making it difficult to dispose of them promptly or at an acceptable price. Manioudakis invested the Fund's assets in illiquid or restricted securities beyond this 10% threshold, in violation of the prospectus and Statement of Additional Information.

46. In a similar fashion, it is believed that the Core Bond Fund had approximately $2.1 billion in net assets in December 2007. It is also believed that the Core Bond Fund had used $1.0 billion of leverage through the use of these derivatives. Thus, the Core Bond Fund borrowed about 50% of its total value of assets, higher than the 33.3% that was allowed.

47. By December 2008, the Core Bond Fund had about $1.47 billion in net assets, but it was using about $2 billion of borrowed money or leverage in the Core Bond Fund. Thus, the Core Bond Fund had borrowed more than 100% of its total assets, significantly higher than the 33.3% that was allowed.

48. Like Champion, the Core Bond Fund was allowed to invest up to 25% of its assets in one industry. However, it is believed that the Core Bond Fund had a huge over-concentration in the mortgage industry, well above this 25% amount. During various times throughout the 2008 calendar year, the Core Bond Fund had anywhere from 53% to 64% of its assets in mortgage related bonds. Again, Manioudakis invested the assets of the Core Bond Fund beyond what was allowed.

49. Similarly to Champion, the Core Bond Fund was allowed to invest up to 15% of its assets in "illiquid" or "restricted" securities – securities which have no active trading market, making it difficult to dispose of them promptly or at an acceptable price. Manioudakis

invested the Core Bond Fund's assets in illiquid or restricted securities beyond this 15% threshold, in violation of the prospectus and Statement of Additional Information.

50.    The Defendants are likely to argue that the 2008 subprime mortgage collapse affected the market as a whole.  However, a comparison of the Champion Fund to aggregate bond indices shows how horrific the Champion Income Fund's performance was.   For example, compare the class A shares of the Champion Income Fund to Lehman Brothers' Aggregate Bond Index in the chart below:



51.    Moreover, the Core Bond Fund's performance was also terrible.  Compare the class C shares of the Core Bond Fund to Lehman Brothers' Aggregate Bond Index in the chart below:



52.   Incredibly, as the Core Bond Fund was falling during the first half of 2008, Oppenheimer

told the investors through the June 30, 2008 Semi-Annual Report that it was "**critical to**

**stay the course**" (emphasis added).   The Semi-Annual Report adds:

> Yes, it's smart to adjust your expectations, **but a period of uncertainty is not the**
> **time to make dramatic shifts in your portfolio or long-term strategy.  Our**
> **own investment teams follow this philosophy**.  Instead of chasing hot money
> and quick returns, they understand that over the long term, markets are driven by
> underlying fundamentals and that those who have the discipline and perseverance
> to stick to their objectives will ultimately be rewarded (emphasis added).

It was representations like this that induced the Plaintiff and others to continue holding

their shares of the Core Bond Fund as their losses mounted.

### Mr. Bernard's Investments

53.   Mr. Bernard initially invested $75,000 in the Core Bond Fund and $95,750 in the

Oppenheimer High Yield Fund in 2005.   In October 2006, the High Yield Fund was

merged into the Champion Income Fund, and thus Mr. Bernard's High Yield Fund shares

were converted to the Champion Income Fund.

54.     In April 2007, Mr. Bernard was convinced to sell $50,000 shares of the Core Bond Fund and invest that that $50,000 in the Champion Income Fund.

55.     To date, Mr. Bernard has lost approximately $125,000 Champion Income Fund and the Core Bond Fund.

56.     In a letter dated September 26, 2008, John Murphy, the Chairman and CEO of OFI sent a letter out to the Oppenheimer clients, including those like the Plaintiff who invested in the Champion Income Fund.   This letter encouraged investors to stay invested in the Oppenheimer mutual funds, even as they continued to plummet in value.   The letter states:

You and I, along with mutual fund investors across the country are facing the most challenging market environment in recent memory.   Each day, it seems we awake to a new distressing headline.   **This can make it all too easy to become swept up by the panic of the moment, lose sight of our long-term goals and abandon our well-considered financial strategies**.

**The importance of discipline**
Unfortunately, I can't say for sure when the markets will regain their footing.   **However, I can tell you that times of uncertainty are not times to make dramatic shifts in your portfolio.   Historically speaking, those who have had the discipline and perseverance to stick to their objectives and maintain a well-diversified portfolio have ultimately been rewarded.**

That's why our investments teams, composed of experienced analysts and portfolio managers, **operate with a long-term view of the economy and the financial markets**. **Rather than reacting to short-term events, or chasing performance, they take a steady, measured approach to portfolio management**.   Each fund's management team adheres to the mandates laid out in the fund's prospectus and the investment strategies that have created value for shareholders over time.

**Remember: You're not in this alone**
At OppenheimerFunds, we recognize that you have entrusted your money to us as part of a strategy to build a sound financial future.   This is a trust we take very seriously and one with which we can identify.   **Our employees and their families, as well as the Trustees/Directors of the Oppenheimer funds, have over $3 billion of their money invested alongside yours in the Oppenheimer funds**.   We work diligently so that our shared investments may help us all attain our financial goals.

A copy of this September 26, 2008 letter is attached hereto as **Exhibit 2** (emphasis added).

57. Representations like this caused the Plaintiff and other investors to stay invested in the Champion Income Fund, and caused them to incur further losses as the value of Champion substantially decreased.

58. Based on the information provided by Oppenheimer and by his broker Vesna Raniasavljevic, Mr. Bernard believed that there was minimal risk in the Champion Income Fund and Core Bond Fund.

## <u>COUNT I – Florida Securities and Investor Protection Act</u>
(Plaintiff v. All Defendants)

59. Plaintiff Jacques Bernard restates and realleges paragraphs 1 through 58 as though fully stated herein as paragraph 59.

60. At all times material herein, there existed in the Florida Statutes, Chapter 517 known as "Florida Securities and Investor Protection Act" ("FSIPA").  Section 517.301 provides:

It is unlawful and a violation of the provisions of this Chapter for a person (a) in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment security...

1. to employ any device, scheme or artifice to defraud;

2. to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3. to engage in any transaction, practice, or course of their business which would operate as a fraud or deceit upon a person.

See Fl. Stat. § 517.301.

61. Section 517.211 of the FSIPA also provides in pertinent part:

2)      Any person purchasing or selling a security in violation of Section

517.301 and any director, officer, partner or agent of or for the purchaser or seller ... is

jointly and severally liable to the person selling the security or purchasing the security...in

an action for rescission…or for damages…

3)      In an action for rescission: a) A purchaser may recover the consideration

paid for the security or investment, plus interest thereon at the legal rate, less the amount

of any income received by the purchaser on the security or investment upon tender of the

security or investment

***

6)      In any action brought under this section including an appeal, the court

**shall** award reasonable attorneys' fees to the prevailing party unless the court finds that

the award of such fees would be unjust.

62.    At all times mentioned herein the investments in the Champion Income Fund and Core

Bond Fund were "securities" within the definitions of the FSIPA.

63.    Defendants used deception, false promises, and misrepresentations to hide the full risks

of the Champion Income Fund and Core Bond Fund.

64.    Defendants, with knowledge of, or with unreasonable disregard for the truth, participated

in a course of conduct whereby Plaintiff's funds were placed in jeopardy, then lost due to

improper investments in extremely speculative securities.  Defendants knew, or should

have known of the risks associated in putting Plaintiff's funds in these speculative

securities.

65.    By reason of the conduct alleged herein, Defendants knowingly and/or recklessly,

directly and indirectly have violated the FSIPA in that they made untrue statements of

material facts, and omitted to state material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading, and engaged in a practice that worked a fraud or deceit on the Plaintiff.

66. Moreover, the Defendants invested the Funds' assets outside of the permissible parameters of the Funds by investing in too much illiquid or restricted securities, by investing too much in one industry, and by investing with too much leverage.

67. Defendants intentionally and fraudulently concealed that the level of risk and speculative nature of the derivatives and mortgage backed securities in which the Funds were concentrated in.

68. The false and fraudulent statements regarding the risks and characteristics of the Champion Income Fund and Core Bond Fund constituted a scheme to defraud pursuant to the FSIPA.

69. It was the intention of the Defendants that the Plaintiff rely on these false statements and representations.

70. The Plaintiff reasonably and justifiably relied on the truth of the statements made by Defendants when he initially invested in both Funds, when he continued to stay invested in the Funds, and when he made subsequent investments in the Funds.

71. As a direct and proximate result of Defendants' fraudulent course of conduct, the Plaintiff suffered financial damage in an amount in excess of $125,000 plus loss of interest.

72. Defendants OFI and OFDI should be jointly and severally liable to the same extent as Defendant Manioudakis, as OFI and OFDI directly and indirectly controlled Manioudakis' conduct and actions.

WHEREFORE, the plaintiff prays for judgment against the defendants for:

a.      actual damages;

b.      Interest, pursuant to Fl. Stat. § 517.211;

c.      attorney fees, pursuant to Fl. Stat. § 517.211; and

d.      such other and further remedy that the Court deems just and equitable.

### COUNT II - Common Law Fraud
(Plaintiff v. All Defendants)

73.     Plaintiff Jacques Bernard and realleges paragraphs 1 through 72 as though fully stated

herein as paragraph 73.

74.     The Defendants misrepresented the level of risk associated with the Champion Income

Fund by portraying the Fund as not having "undue risk", by representing that it would be

"appropriate as a part of a retirement plan portfolio", and by representing the Fund as

being well-diversified. The Defendants misrepresented the level of risk associated with

the Core Bond Fund by portraying the Fund as being diversified and as investing in

mostly investment-grade debt securities.

75.     In fact, the Champion Income Fund was extraordinarily risky and lost approximately

80% of its value in less than one year.  The Core Bond Fund was also extraordinarily

risky and lost approximately 36% of its value in less than one year.

76.     The Defendants knew the aforesaid statements were false at the time they were made to

Plaintiffs.

77.     The Defendants made the false statements with the intent to induce the Plaintiff to invest

money in these Funds and to keep the money invested in the Funds as the Funds took on

excessive risk.

78.     The Plaintiff relied on the truth of the statements made by Defendants when he initially

invested in both Funds, when he continued to stay invested in the Funds, and when he made subsequent investments in the Funds.

79.    As a result of the reliance on the aforesaid false statements, the plaintiff suffered financial loss.

80.    Furthermore, Defendants conduct was willful and malicious and a violation of trust and confidence.

WHEREFORE, the plaintiff prays for judgment against the defendants for:

a.    actual damages;

b.    attorney fees;

c.    reasonable costs; and

d.    any other remedy that the Court deems just and equitable.

## COUNT III – Negligent Misrepresentation
(Plaintiff v. All Defendants)

81.    Plaintiff Jacques Bernard restates and realleges paragraphs 1 through 80 as though fully stated herein as paragraph 81.

82.    The Defendants are in the business of supplying information in that they provide information (albeit, incomplete and misleading information) to investors to make decisions about the funds that they are purchasing.

83.    The Defendants had a duty to supply accurate information to the Plaintiff about the risks and characteristics of the Champion Income Fund and the Core Bond Fund.

84.    The Defendants failed that duty to supply accurate information and misrepresented the level of risk associated with these Funds by portraying them as not having "undue risk", by representing that it would be "appropriate as a part of a retirement plan portfolio", and

by representing the Funds as being well-diversified.

85.    The aforementioned statements were false and misleading.

86.    The Defendants made the false statements with the intent to induce the Plaintiff to invest money in the Champion Income Fund and Core Bond Fund and to keep the money invested in the Funds as the Funds took on excessive risk.

87.    The Plaintiff relied on the truth of the statements made by Defendants when he initially invested in both Funds, when he continued to stay invested in the Funds, and when he made subsequent investments in the Funds.

88.    As a direct and proximate result of the reliance on the aforesaid false statements, the plaintiff suffered financial loss.

WHEREFORE, the plaintiff prays for judgment against the defendants for:

a.    actual damages;

b.    attorney fees;

c.    reasonable costs; and

d.    any other remedy that the Court deems just and equitable.

### <u>COUNT IV – Negligent Supervision</u>
(Plaintiff v. OFI and OFDI)

89.    Plaintiff Jacques Bernard restates and realleges paragraphs 1 through 88 as though fully stated herein as paragraph 89.

90.    At all times relevant, Defendants OFI and OFDI had duties to supervise its agents and registered representatives, including Defendant Manioudakis, to protect their customers.

91.    Defendants OFI and OFDI had a duty to provide procedures and policies to supervise Manioudakis to ensure that he invested both Funds' assets properly and within the

confines of the Funds' investment parameters as outlined in the Funds' Prospectuses and Statements of Additional Information.

92.   Defendants OFI and OFDI breached its duty to its customers, including Plaintiff, by the following acts or omissions:

a.   Failing to adequately supervise Defendant Manioudakis;

b.   Failing to establish adequate and/or written procedures to supervise and monitor the conduct of Defendant Manioudakis;

c.   Failing to enforce its supervisory procedures and policies to monitor the conduct of Defendant Manioudakis; and

d.   Failing to ensure that Manioudakis' trading strategy was proper in light of the investment objectives of the Funds.

93.   As a direct and proximate result of Defendant OFI's and OFDI's breach of their duties, the plaintiff suffered financial damage, plus loss of interest.

WHEREFORE, the plaintiff prays for judgment against the defendants for:

a.   actual damages;

b.   attorney fees;

c.   reasonable costs; and

d.   any other remedy that the Court deems just and equitable.

## COUNT V – Colorado Consumer Protection Act
### (Plaintiff v. All Defendants)

94.   Plaintiff Jacques Bernard restates and realleges paragraphs 1 through 93 as though fully stated herein as paragraph 94.

95.   At all times material herein, there existed in the State of Colorado, a statute entitled the

Consumer Protection Act ("CPA"), C.R.S. § 6-1-101 et seq, which provides:

(e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;
***
(g) Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;
***
(u) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

C.R.S. § 6-1-105 (2008)

96.     Defendants used deception, false promises, and misrepresentations to hide the full risks of the Champion Income Fund and Core Bond Fund.

97.     Moreover, the Defendants invested the Funds' assets outside of the permissible parameters of the Funds by investing in too much illiquid or restricted securities, by investing too much in one industry, and by investing with too much leverage.  This also constitutes deceptive or unfair practices in violation of the Consumer Protection Act.

98.     Defendants intentionally and fraudulently concealed that the level of risk and speculative nature of the derivatives and mortgage backed securities in which the Champion Income Fund and Core Bond Fund were concentrated in.

99.     This deceptive practices were made in the course of the Defendants' business, which is to manage, sell, and distribute financial products like the Champion Income Fund and Core Bond Fund.

100.    The losses in the Champion Income Fund and Core Bond Fund not only affected to the Plaintiff, but it affected thousands of other investors.   This deceptive practice

significantly impacted the public as actual consumers of the Defendants' products and services.

101.  The false and fraudulent statements regarding the risks and characteristics of the Funds constituted a deceptive act or practice pursuant to the Consumer Fraud Act.

102.  The aforesaid course of conduct of the Defendants arose out the Plaintiff's dealings with Defendants in pursuit of financial security, and as such, was involved in trade or commerce.

103.  It was the intention of the Defendants that the Plaintiff rely on these false statements and representations.

104.  As a direct and proximate result of Defendants' fraudulent course of conduct, the Plaintiff suffered financial damage in an amount in excess of $125,000 plus loss of interest.

WHEREFORE, the plaintiff prays for judgment against the defendants for:

e.  actual damages, pursuant to C.R.S. § 6-1-113;

f.  treble damages, pursuant to C.R.S. § 6-1-113;

g.  attorney fees, pursuant to C.R.S. § 6-1-113;

h.  reasonable costs, pursuant to C.R.S. § 6-1-113: and

i.  such other and further remedy that the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,


s/ David Neuman

One of the Plaintiff's Attorneys

David Neuman
Stoltmann Law Offices, P.C.
10 S. LaSalle St., Suite 3500
Chicago, IL 60603
Tel: (312) 332-4200
Fax: (312) 332-4201
daveneuman@stoltlaw.com